**DISTRICT COURT OF THE VIRGIN ISLANDS**
**DIVISION OF ST. THOMAS AND ST. JOHN**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Case No. 3:20-cr-0005** |
| | ) | |
| **LEROY HENRY, JR.,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**APPEARANCES:**

**Gretchen C.F. Shappert, United States Attorney**
**Meredith Jean Edwards, AUSA**
United States Attorney's Office
St. Thomas, U.S.V.I.
        *For the United States of America,*

**Matthew Campbell, Federal Public Defender**
**Melanie Lark Turnbull, AFPD**
Office of the Federal Public Defender
St. Thomas, U.S.V.I.
        *For Leroy Henry, Jr.*

**MEMORANDUM OPINION**

**MOLLOY, J.**

        **BEFORE THE COURT** is Leroy Henry's motion to supress evidence and statements in this case. (ECF No. 15.) For the reasons stated below, the Court will deny the motion.

## I.        BACKGROUND

        The relevant facts pertaining to the motion to suppress evidence are derived from the affidavit in support of a January 10, 2020 search warrant that is at issue in this matter. Additionally, the relevant facts that pertain to the motion to suppress statements were adduced during the course of a December 2, 2020 omnibus hearing in this matter. At that hearing, the Court heard testimony from a single witness, Virgin Islands Police Department ("VIPD") Sergeant and FBI Task Force Officer Richard Dominguez ("TFO Dominguez"). The evidence and testimony introduced reveal the following circumstances.

On December 25, 2019, the FBI Gang and Violent Crime Task Force office in St. Thomas received an anonymous tip through Crimestoppers USVI. *See* Affidavit in Support of a Search Warrant at 2, ECF No. 66. The anonymous tipster stated, "Leroy Henry Jr. the brother of Jackeel Henry who was shot this week is a convicted felon carrying an[] unregistered firearm." *Id.* at 3. The anonymous tipster further stated that "the interior of his center console between the driver & passenger seat of his Infiniti car has a secret compartment that lifts out. And he keeps a loaded handgun in there." *Id.* In response to the question, "does the suspect have any plans to use this weapon?" the tipster responded, "[y]es, revenge for brother's death." *Id.*

Thereafter, on January 10, 2020, TFO Dominguez obtained a search warrant from a magistrate judge in the Virgin Islands Superior Court to search a blue, four-door 2007 Infinity M35, bearing Virgin Islands license plate number TEZ-288, (the "Target Vehicle"). *See* Search Warrant, ECF No. 66. The affidavit in support of the search warrant includes the information received from the anonymous tipster on December 25, 2019. *See* Affidavit in Support of a Search Warrant at 2-3, ECF No. 66. The affidavit in support of the search warrant also asserts that agents had independently confirmed that (1) Jackeel Henry, Leroy Henry Jr.'s brother, was shot and killed by an unknown assailant on December 21, 2019; (2) Leroy Henry Jr. was convicted of possession of an unlicensed firearm in the Virgin Islands Superior Court on October 18, 2013; (3) Leroy Henry Jr. does not have a valid license to possess a firearm in the Virgin Islands; (4) Leroy Henry Jr. is the registered owner of a 2007 Infiniti M35 (the Target Vehicle); and (5) the Target Vehicle was parked in front of 6A-73 Bovoni, a residence owned by Leroy Henry Sr, on January 10, 2020. *Id.* at 3. Based on these facts, the affidavit asserts that:

> [b]ased upon the circumstances surrounding the shooting death of Leroy Henry Jr.'s brother, law enforcement agents have reason to believe that Leroy Henry Jr. may indeed be currently seeking to uncover the identity of his brother's murderer and upon doing so utilize the illegal firearm described to shoot the alleged murderer.

*Id.* at 3-4.

TFO Dominguez testified that, on January 14, 2020, he and at least four other law enforcement officers performed a traffic stop on Leroy Henry Jr.'s ("Henry") vehicle. During

the stop, law enforcement officers had long guns slung across their bodies and holstered pistols, but no weapons were drawn. Subsequently, TFO Dominguez transported Henry to the FBI office in the back of TFO Dominguez's marked police car. Law enforcement officers also brought Henry's vehicle to the FBI office. TFO Dominguez testified that, during the drive to the FBI office, he offered condolences for the passing of Henry's brother. TFO Dominguez further testified that thereafter, Henry began a conversation with TFO Dominguez in which Henry stated that he wanted to talk to TFO Dominguez about the investigation into Henry's brother's death. TFO Dominguez replied that that discussion would have to wait until they arrived at the FBI office.

After arriving at the FBI office, TFO Dominguez placed Henry in an interview room while law enforcement officers performed a search of Henry's vehicle. Upon searching Henry's vehicle, the officers recovered a loaded firearm and two magazines from a secret compartment within the vehicle's center console.

Meanwhile, TFO Dominguez began to interview Henry. The video recording of the interview reveals that TFO Dominguez read Henry his *Miranda* rights from a standard FBI Advice of Rights form at the start of the interview. The video recording further reveals that TFO Dominguez asked Henry to sign the form and Henry replied, "when I'm ready, when I can go, then me and you will talk, okay?" TFO Dominguez then asked Henry if he understood his rights and Henry responded affirmatively. TFO Dominguez further explained that "so the only thing the signing part is that you've decided to talk to us without the presence of an attorney." Henry responded by nodding his head and giving a thumbs up. Subsequently, Henry stated that he would talk to TFO Dominguez "when I'm free to go." TFO Dominguez again asked Henry to sign the advice of rights form and informed Henry that signing "is up to you." Henry replied that he was "still thinking." Thereafter, TFO Dominguez left the advice of rights form in the room with Henry.

Approximately four minutes later, TFO Dominguez returned to the interview room with FBI Agent Chris Forvour ("Agent Forvour"). After Henry stated that he was cold, Agent Forvour offered and retrieved a sweater for Henry. Returning to the topic of the advice of rights form, Henry expressed concern that he would "end up dead." TFO Dominguez assured

Henry that signing the advice of rights form was simply an acknowledgement that Henry had been read his rights and agreed to speak with law enforcement. Henry did not sign the form.

Thereafter, TFO Dominguez and Agent Forvour discussed the murder of Henry's brother with Henry for approximately 12 minutes. Subsequently, the discussion turned to the subject of the firearm law enforcement had recovered from the search of Henry's vehicle. Henry admitted to the fact of a previous felony conviction, knowing that he is not permitted to have a firearm, and possessing the firearm. Henry also confirmed that he had read the search warrant and was aware that law enforcement was searching for a gun in his car. After the interview, law enforcement placed Henry under arrest pursuant to a criminal complaint.

On January 30, 2020, a federal grand jury returned an indictment charging Henry with two counts. The first count charges Henry with being a felon in possession of a firearm, specifically a Glock pistol, in violation of 18 U.S.C. § 922(g)(1). The second count charges Henry with being a felon in possession of ammunition, specifically 49 rounds of .40 caliber ammunition, in violation of 18 U.S.C. § 922(g)(1).

On February 24, 2020, Henry filed a motion to suppress all physical evidence and statements in this case. (ECF No. 15.) Henry argues that the January 10, 2020 search warrant lacked probable cause. Henry also argues that his statements were taken in violation of the Fifth Amendment because they were not voluntary.

On March 9, 2020, the United States filed an opposition to Henry's motion to suppress. (ECF No. 21.) The United States argues that the January 10, 2020 search warrant was supported by probable cause, but that even if it did lack probable cause, law enforcement officers relied on the January 10, 2020 search warrant in good faith. The United States also argues that Henry knowingly and voluntarily waived his *Miranda* rights and voluntarily made statements to law enforcement.[1]

---

[1] Additionally, on May 13, 2020, the United States filed a motion to preclude Henry from asserting the defenses of duress, necessity, and/or justification. (ECF No. 28.) Henry did not file an opposition. At the December 2, 2020 omnibus hearing, Henry represented that he would not present the defenses of duress, necessity, and/or justification. As such, the Court finds that the motion of the United States to preclude Henry from asserting the defenses of duress, necessity, and/or justification is moot.

## II.      DISCUSSION

### A. The January 10, 2020 Search Warrant Lacked Probable Cause

Henry first argues that the January 10, 2020 search warrant signed by a magistrate judge in the Virgin Islands Superior Court lacked probable cause. Specifically, Henry argues that there was "no indication of the [anonymous] informant's veracity or reliability found anywhere within the four corners of the warrant." *See* Mot. To Suppress at 3, ECF No. 15. Henry emphasizes that the warrant "does not provide for how the informant would have obtained the information, his relationship to Mr. Henry, his proximity to the alleged criminal activity, or whether officers had relied on information from this informant on prior occasions." *Id.* at 3-4. Additionally, Henry argues that the information corroborated by the police—Henry's felony conviction and the recent murder of his brother—"merely confirms innocuous information that does not give rise to probable cause." *Id.* at 4.

The threshold requirement for issuance of a warrant is probable cause. Probable cause is a "fluid concept" that "turn[s] on the assessment of probabilities in particular factual contexts." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). Such probabilities "are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Id.* at 231. "Probable cause can be, and often is, inferred from 'the type of crime, the nature of the items sought, the suspect's opportunity for concealment and normal inferences about where a criminal might hide [evidence].'" *United States v. Stearn*, 597 F.3d 540, 554 (3d Cir. 2010) (alterations in original). When issuing a warrant, "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238.

"[I]n reviewing the issuance of a warrant . . ., [courts] are to determine whether the magistrate had a 'substantial basis' for concluding that probable cause was present." *United States v. Ritter*, 416 F.3d 256, 262 (3d Cir. 2005) (citations omitted). A reviewing court "is not to make [its] own assessment as to whether probable cause existed. Rather, [it is]

constrained to determine only whether the affidavit provides a sufficient basis for the decision the magistrate judge actually made." *United States v. Jones*, 994 F.2d 1051, 1057 (3d Cir. 1993). "[S]uch deference 'does not mean that reviewing courts should simply rubber stamp a magistrate's conclusions.'" *Id.* at 1055 (citations omitted). "But it does mean that 'the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants.'" *Id.*

"'Tipster' cases, whether involving probable cause or reasonable suspicion determinations, focus on the tip's indicia of reliability." *United States v. Henley*, 941 F.3d 646, 654 (3d Cir. 2019). In the context of anonymous tips, the Supreme Court has made clear that "an informant's 'veracity,' 'reliability,' and 'basis of knowledge' . . . [are] 'highly relevant in determining the value of his report.'" *Alabama v. White*, 496 U.S. 325, 328 (1990) (quoting *Gates*, 462 U.S. at 230). Of course, "an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity." *White*, 496 U.S. at 329. That is because "ordinary citizens generally do not provide extensive recitations of the basis of their everyday observations," and an anonymous tipster's veracity is "'by hypothesis largely unknown, and unknowable.'" *Id.* "[W]here there is no basis for determining the reliability of a tip from the informant, the information contained in the tip cannot by itself be sufficient to provide probable cause." *United States v. Nelson*, 284 F.3d 472, 479-80 (3d Cir. 2002). "Instead, police must investigate further to provide independent corroboration of the tip." *Id.* at 480. "Such independent corroboration is measured by both the quantity and quality of the totality of the circumstances." *Id.* "If, for example, a tip on its own carries few indicia of reliability, much corroborating information is necessary to demonstrate reasonable suspicion." *Id.* "[W]here the tip contains information that later investigation contradicts, or that is of such a general nature as to be easily obtained by any observer, there is no reasonable suspicion," *id.*, and consequently, no probable cause.

In order to address Henry's arguments, the Court finds a review the Supreme Court's anonymous tip jurisprudence in *Illinois v. Gates*, 462 U.S. 213 (1983), *Alabama v. White*, 496 U.S. 325 (1990), and *Florida v. J.L.*, 529 U.S. 266 (2000), to be useful.

In *Illinois v. Gates*, police received an anonymous letter that alleged that Sue and Lance Gates ("the Gateses") were selling drugs. 462 U.S. at 225. The letter identified where the Gateses lived and described a pattern of conduct related to the alleged drug trafficking. *Id.* Specifically, the letter alleged that (1) the Gateses normally purchased drugs in Florida, (2) Sue Gates would drive their car to Florida where she would leave it to be loaded with drugs and thereafter fly back, (3) Lance Gates would then fly down and drive the car back to Illinois, (4) Sue Gates was presently driving down to Florida on such a trip, and (5) Lance Gates would be flying down a few days later to drive the car back loaded with drugs. *Id.* Pursuing the tip, police verified that Lance Gates was scheduled to fly out from Chicago to West Palm Beach, Florida, in two days. *Id.* at 226. Thereafter, law enforcement surveilled Lance Gates during his trip to Florida. *Id.* Agents observed him arrive in West Palm Beach and take a taxi to a nearby hotel where he went to a room registered to Susan Gates. *Id.* Early the next morning, Lance Gates then departed in a car registered to him and drove northbound on an interstate highway frequently used by travelers to the Chicago area. *Id.* Based on the letter and surveillance, police obtained a search warrant for the Gateses' home and car. *Id.* Upon searching the Gateses' home and car, police found marijuana, weapons, and other contraband. *Id.* at 227.

The Gateses moved to suppress the items recovered from the search, asserting that the warrant lacked probable cause. The Supreme Court concluded that the magistrate issuing the warrant had a substantial basis for concluding that probable cause to search the Gateses' home and car existed. *Id.* at 246. In doing so, the Supreme Court reaffirmed that the totality of the circumstances, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, informs the probable cause inquiry undertaken by the issuing magistrate. *Id.* at 238. With respect to the particular circumstances before it, the Supreme Court explained that "standing alone, the anonymous letter . . . would not provide the basis for . . . probable cause," *id.* at 227, because "[t]he letter provides virtually nothing from which one might conclude that its author is either honest or his information reliable; likewise, the letter gives absolutely no indication of the basis for the writer's predictions regarding the Gateses' criminal activities," *id.*

Nevertheless, with respect to the veracity and reliability of the letter, the subsequent "corroboration of the letter's predictions that the Gateses' car would be in Florida, that Lance Gates would fly to Florida in the next day or so, and that he would drive the car north toward [Illinois] all indicated, albeit not with certainty, that the informant's other assertions also were true." *Id.* at 244. Moreover, with respect to the letterwriter's basis of knowledge, "the anonymous letter contained a range of details relating not just to easily obtained facts and conditions existing at the time of the tip, but to future actions of third parties ordinarily not easily predicted." *Id.* at 245. Because such information is "of a character likely obtained only from the Gateses themselves, or from someone familiar with their not entirely ordinary travel plans, . . . a magistrate could properly conclude that . . . [the letterwriter] also had access to reliable information of the Gateses' alleged illegal activities." *Id.* Indeed, "corroboration of major portions of the letter's predictions provides," *id.* at 246, "a fair probability that the writer of the anonymous letter had obtained his entire story either from the Gateses or someone they trusted," *id.* As such, a substantial basis for concluding that probable cause to search the Gateses' home and car existed. *Id.*

In *Alabama v. White*, an anonymous tipster told the police that, at a particular time, Vanessa White ("White") would be driving from 235-C Lynwood Terrace Apartments (the "apartment building") to Dobey's Motel (the "motel") in a brown Plymouth station wagon with a broken right tail light. 496 U.S. at 327. The tipster further asserted that the woman would be transporting cocaine. *Id.* After receiving the tip, officers immediately proceeded to the apartment building. *Id.* at 331. The officers observed a brown Plymouth station wagon with a broken right taillight in the parking lot in front of the apartment building. *Id.* at 327. Not long after arriving, the officers observed a woman leave the apartment building and drive away in the station wagon. *Id.* The officers stopped the station wagon as it neared the motel. *Id.* After receiving consent to search the car for cocaine, the officers found marijuana in the car. *Id.* The officers arrested White. *Id.* During processing at the station, the officers also found three milligrams of cocaine in White's purse. *Id.*

White moved to suppress the drugs. White asserted that she was subject to an unconstitutional stop because officers lacked reasonable suspicion to conduct an

*United States v. Henry*
Case No. 3:20-cr-0005
Memorandum Opinion
Page 9 of 27

investigatory stop. The Supreme Court held that the officers' corroboration of the car description, departure time, departure location, and destination made the anonymous tip sufficiently reliable to create reasonable suspicion of criminal activity. Although it was a "close case," *id.* at 332, by accurately predicting future behavior, the tipster demonstrated "a special familiarity with respondent's affairs," *id.*, which in turn implied that the tipster had "access to reliable information about that individual's illegal activities." *Id.* The Supreme Court also recognized that an informant who is proved to tell the truth about some things is more likely to tell the truth about other things, "including the claim that the object of the tip is engaged in criminal activity." *Id.* at 331 (citing *Gates*, 462 U.S. at 244).

By contrast, in *Florida v. J.L.*, the Supreme Court determined that no reasonable suspicion arose from a bare bones tip from an anonymous caller that a young black male in a plaid shirt standing at a particular bus stop was carrying a gun. 529 U.S. at 268. The tipster did not explain how he knew about the gun. *Id.* at 271. The tipster also did not suggest that he had any special familiarity with the young man's affairs. *Id.* Additionally, the tipster was unknown and thus unaccountable if his allegations turned out to be fabricated. *Id.* Significantly, the Supreme Court explained that "[t]he anonymous call concerning J. L. provided no predictive information and therefore left the police without means to test the informant's knowledge or credibility." *Id.* Indeed, "[a]ll the police had to go on . . . was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J. L." *Id.* Rejecting the argument that the tip was reliable because its description of the suspect's visible attributes proved accurate, the Supreme Court further explained that

> An accurate description of a subject's readily observable location and appearance is of course reliable in this limited sense: It will help the police correctly identify the person whom the tipster means to accuse. Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity. The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person.

*Id. at 272.* Accordingly, the Supreme Court concluded that the tip was insufficiently reliable to justify a stop and frisk based on reasonable suspicion.

In addition to the Supreme Court's anonymous tip jurisprudence, the Court also finds a review of the Third Circuit's decision in *United States v. Ritter*, 416 F.3d 256 (3d Cir. 2005), to be necessary. In *Ritter*, Virgin Islands Police Department Officer Christopher Howell ("Officer Howell") received two anonymous calls alleging that residents of a certain property were growing marijuana on the premises behind the residence. *Id.* at 259. The anonymous tipster did not identify the residents by name, but asserted additional information in the second call: first, that she had personally observed someone carrying marijuana plants into the house, and second, that she had heard from another person that there were also at least two indoor grow rooms.[2] *Id.* The tipster did not provide descriptions of the residents nor indicate where in the house plants were growing. *Id.* Following the second call, Officer Howell applied for, and was issued, a search warrant. *Id.* Officer Howell did not undertake any corroborative investigation of the tip. *Id.* Rather, he based his affidavit in support of probable cause on the anonymous tips and a previous drug raid of the property in which marijuana plants growing on the premises were discovered and destroyed and a gardener was apprehended. *Id.* The previous raid—which occurred approximately eight months prior to the anonymous tips—had been conducted without a warrant after Officer Howell had observed marijuana growing in a roofless stable at the rear of the house while conducting aerial surveillance. *Id.* at 258-59. Thereafter, Officer Howell and numerous law enforcement officers executed the warrant, ultimately recovering marijuana, guns, and cash from various locations on the property. *Id.* at 259-260.

The residents of the property—Ernie, Reginald, and Dale Ritter—were criminally charged and moved to suppress the evidence recovered from the search arguing that the warrant lacked probable cause. *Id.* at 260. The district court found that the warrant was supported by probable cause, but nevertheless granted the motion to suppress on other grounds. *Id.* On appeal, the Third Circuit concluded that the magistrate had a substantial basis for finding probable cause existed. *Id.* at 264. Analyzing the facts at issue, the Third Circuit explained that

> Here, . . . Officer Howell, after receiving an anonymous tip call, made no attempt
> to verify the informant's allegations through further independent

---

[2] Officer Howell received both calls and testified that he believed the tipster to be the same person. *Id.*

> investigation. But, . . . Howell did have arguably relevant previous experience with the property in question and included this "historical information [regarding] the previous seizure in August 2002" in his affidavit. The question is whether this experience was sufficiently corroborative so as to give the tip predictive value. It could be said that the connection to the previous raid was tenuous in terms of actual corroboration - it occurred seven months before, the marijuana was being grown in the stable area, the person apprehended was the gardener who apparently did not live on the premises, and there appears to have been no direct connection to the house or its inhabitants. However, Officer Howell's previous observation, the similarity of the type of offense, the fact that the current tip involved both the house and the surrounding outdoor area, and the logical inference that the gardener might have been authorized by the inhabitants of the house to grow the marijuana, all point to the plausible relationship between the previous event and the tip. We can see how an officer and a magistrate could view the tip as establishing an identifiable pattern of activity on the premises.

*Id.* at 263 (alteration in original). Thus, despite noting that it was a close case and that the panel might reach a different result were they reviewing the magistrate's decision *de novo*, the Third Circuit concluded that "the deferential standard with which we view the magistrate's initial probable cause determination tips the scale in favor of determining that the magistrate had a 'substantial basis' for finding probable cause existed." *Id.* at 264.

Judge Smith dissented in part but concurred in the judgment. *Id.* at 279 (Smith, J., dissenting in part). Judge Smith explained that the conclusion that the warrant was properly issued was flawed because the information from the previous drug raid of the property was stale and the anonymous tip contained no predictive information—leaving law enforcement without the means to test the informant's knowledge or credibility. *Id.* at 270 (Smith, J., dissenting in part). Because the tip in the case contained "nothing to corroborate except for the illegal activity itself," *id.* at 273 (Smith, J., dissenting in part), and police did not investigate or surveil the Ritters' property to discover any independent suspicious activity or activity that could corroborate the tip,[3] Judge Smith concluded that the magistrate lacked a substantial basis for finding probable cause to issue the warrant. *Id.* at 279 (Smith, J., dissenting in part). Nevertheless, Judge Smith concluded that the good faith exception under

---

[3] *See id.* at 277 n.21 (Smith, J., dissenting in part) (discussing possible investigatory actions that Officer Howell could have taken to obtain "information properly supportive of a search warrant").

*Leon* should apply because "it would be unrealistic to conclude that Officer Howell should have recognized, questioned, and correctly applied the nuances of . . . anonymous tip corroboration doctrine," *id.* (Smith, J., dissenting in part), where the corroboration issues in the case had resulted in different conclusions by the various reviewing judges.

Finally, the Court finds a review of a Tenth Circuit case that applies *Gates*, *White*, and *J.L.* to be instructive in addressing the issues in this matter. In *United States v. Tuter*, 240 F.3d 1292 (10th Cir. 2001), an anonymous caller phoned a nationwide tipline and reported that a thirty-eight year old white man named Chris Tuter ("Tuter"), living at 4104 West Princeton Street in Broken Arrow, Oklahoma, was making pipe bombs in his garage. 240 F.3d at 1294. The tipline operator further recorded that the caller reported that Tuter had a twelve-year-old son named Ian who lived with Tuter and attended a particular school. *Id.* The caller also alleged that Ian had been known to show weapons to school friends when at Tuter's home. *Id.* The anonymous caller also described the kind of weapons Tuter possessed as "RIFLE/AKA," and stated that Tuter owned a gold colored 1997 Jeep Cherokee. *Id.* The record from the tipline operator indicated that the anonymous caller's information was "FIRSTHAND," but did not provide any further explanation as to how the caller obtained the reported information. *Id.*

Upon receiving the tip, a law enforcement agent verified that a thirty-eight-year-old white male named Christopher Tuter lived at 4101 West Princeton Street in Broken Arrow, Oklahoma, with his twelve-year old son Ian. *Id.* The agent further verified that Tuter's spouse, who lived with Tuter, owned a 1997 Jeep Cherokee. *Id.* The agent also investigated Tuter's criminal history and learned that Tuter had three theft-related convictions and two arrests—including one for possession of a firearm after a felony conviction—each of which occurred approximately 15 years prior. *Id.* Finally, the agent learned that, one year prior, the Tuters had reported the theft of a vehicle and that two firearms were inside the vehicle at the time of the theft. *Id.*

The agent applied for, and was issued, a search warrant for Tuter's home based on an affidavit containing the foregoing information. *Id.* Thereafter, a search was conducted in which agents discovered sixteen firearms, ammunition, several grenades, a pipe bomb, and

other related explosive materials. *Id.* at 1293-94. Tuter moved to suppress that evidence arguing that the warrant lacked probable cause. *Id.* at 1295. Relying on *J.L.*, which was issued by the Supreme Court only a few months after the warrant in *Tuter* was issued, the district court ruled that the supporting affidavit was insufficient to establish probable cause because the agent failed to corroborate any of the anonymous tipster's allegations of criminal wrongdoing. *Id.* The district court also rejected application of the good faith exception, and thus suppressed the evidence. *Id.*

The Tenth Circuit reversed the suppression of evidence, affirming that the warrant lacked a substantial basis for determining that probable cause existed, but ultimately concluding that the good faith exception applied. *Id.* at 1298. Significantly, the Tenth Circuit explained that *J.L.* teaches that "corroboration of non-predictive information only cannot be used to confirm the reliability of an anonymous informant for the purpose of establishing even the less demanding standard of reasonable suspicion of criminal activity." *Id.* at 1297 (citing *J.L.*, 529 U.S. at 271). Rejecting the government's argument that the corroboration undertaken in the case was sufficient, the Tenth Circuit explained that

> [the agent] only corroborated innocent, innocuous information about the Tuter's appearance, residence, cars and child. Almost anyone can describe the residents of, and vehicles at, a particular home without having any special knowledge of what goes on inside the home. As made clear in *J.L.*, an accurate description of a suspect's readily observable location and appearance does not, without more, show that "the tipster has knowledge of concealed criminal activity." "Apart from the tip, [the agent] had no reason to suspect . . . illegal conduct" and his suspicion that Tuter was making pipe bombs "arose not from [his] own observations but solely from a call made from an unknown location by an unknown caller." The fact that Tuter had a fifteen-year old criminal history or that his wife legally possessed firearms a year ago is insufficient to corroborate the informant's claim that Tuter was making pipe bombs in his garage.

*Id.* at 1297 (citations omitted). The Tenth Circuit further rejected the argument that the anonymous tip was reliable because the tipline report indicated that the caller's information was firsthand. *Id.* Recognizing that "firsthand observations from a confidential informant can support a finding of reliability[,]" *id.*, the Tenth Circuit explained that "the statement that the caller's information was firsthand [was] completely unsubstantiated," *id.* at 1298. "Moreover, the caller did not provide the kind of highly specific or personal details from

which one could reasonably infer that the caller had firsthand knowledge about the claimed criminal activity." *Id.*

With respect to the good faith exception, the Tenth Circuit explained that, "[a]t the time the underlying affidavit was prepared and the warrant was issued, neither the Supreme Court's *J.L.* decision nor this court's *Danhauer* decision had been issued."[4] *Tuter*, 240 F.3d at 1299. Thus, because the Supreme Court had previously opined that "[i]nnocent behavior frequently will provide the basis for a showing of probable cause[,]" *see Gates*, 462 U.S. at 244 n.13, the Tenth Circuit concluded that the agent "had reason to believe that corroboration of innocent facts, coupled with his investigation leading to discovery of Tuter's criminal history, would be sufficient to establish probable cause." *Id.* In addition, the Tenth Circuit noted that the agent testified that "he contacted an attorney in the U.S. Attorney's office who told him he had sufficient probable cause." *Id.* at 1299-1300.

This case presents very similar circumstances to *Tuter* with respect to the kind of information in the anonymous tip and corroboration undertaken by law enforcement. Here, the anonymous tipster provided accurate information—verified by law enforcement prior to seeking the January 10, 2020 search warrant—regarding Henry's name, a familial relationship with his brother, the fact of the recent shooting of Henry's brother, Henry's

---

[4] The Tenth Circuit summarized its *Danhauer* decision in *Tuter* as follows:

[I]n *United States v. Danhauer*, 229 F.3d 1002 (10th Cir. 2000), we addressed an affidavit similar to the one at issue here. In *Danhauer*, a police officer received information from another officer about a confidential informant's report that Robbi and Dennis Danhauer were cooking methamphetamine in a garage located on their property, and that a person named "Casey" was acting as a lookout in front of their home. The first officer did not reveal the identity of the confidential informant to the investigating officer. The investigating officer independently corroborated that the Danhauers lived at the home identified by the informant, and observed Robbi Danhauer going back and forth between the home and the garage. He also learned that both the Danhauers had recent criminal histories involving drugs and outstanding arrest warrants, and that the day before, Robbi Danhauer had tested positive for methamphetamine and opiates in a probation report. The investigating officer prepared an affidavit based on this information.

We held that this affidavit was insufficient to establish probable cause because "the affiant neither established the veracity of the informant, nor obtained sufficient independent corroboration of the informant's information." The affidavit did "not reveal . . . the informant's basis of knowledge or adequately verify the informant's most serious allegation, that the Danhauers were manufacturing methamphetamine." We held that the police failed to link methamphetamine to the Danhauers' residence.

*Tuter*, 240 F.3d at 1296-97 (citations omitted).

ownership of an Infiniti car, and Henry's status as a convicted felon. None of this information was predictive, and all of it was publicly available information.[5] *See, e.g., Three dead in weekend shootings*, Virgin Islands Daily News (Dec. 23, 2019), http://www.virginislands dailynews.com/news/three-dead-in-weekend-shootings/article_495a9e1b-e339-57c8-8290-5a938dc9a56f.html (last visited Mar. 19, 2021). As such, the accuracy of this information provides little to no support for the Court to conclude that the anonymous tipster had any "special familiarity," *White*, 496 U.S. at 332, with Henry's affairs.

The Court acknowledges that knowledge of certain publicly available information may still suggest a basis for believing that an anonymous tipster has inside information about the subject of the tip. Indeed, certain information, while publicly available, may require greater efforts to obtain than information readily obtained by observation of an individual's present location and appearance. Accurate knowledge of a subject's familial relationships, ownership of a vehicle or residence, and status as a felon—while publicly available were a tipster to search public records—reasonably suggests at least some acquaintance with the subject of the tip. It is certainly possible that an individual unacquainted with a subject might endeavor to obtain such information in order to anonymously report, either maliciously or in good faith, that the subject of their tip is engaged in criminal activity. However, given the greater effort required to obtain such information compared to readily observable information, the Court recognizes that the accuracy of such information is more likely to suggest at least some familiarity with the subject of the tip rather than no familiarity at all.

Nevertheless, to supply probable cause, the anonymous tip in this case must be reliable in its assertion that Henry illegally possessed a firearm. *Cf. J.L.*, 529 U.S. at 272 ("[R]easonable suspicion . . . requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person[.]"). To do so, the principles of *Gates*, *White*,

---

[5] Law enforcement also verified that Henry did not possess a valid license to possess a firearm in the Virgin Islands. While such information may not be public information in that the public does not have access to Virgin Islands firearms licensing records, it is public information that Henry is a convicted felon. In the Virgin Islands, a felon may not obtain a license to possess a firearm. *See* 23 V.I.C. § 456a(a)(1). As such, it is hardly predictive to assert that a convicted felon does not have a license to possess a firearm in the Virgin Islands. Indeed, such knowledge necessarily follows from the public knowledge that an individual is a convicted felon. Thus, for the purposes of the Court's analysis, the Court considers information regarding Henry's lack of a valid firearms license to be publicly available and not predictive.

and *J.L.*, suggest that corroboration of the tip must suggest more than simply acquaintance with the subject of the tip, but rather "a special familiarity with the [suspect's] affairs." *White*, 496 U.S. at 332; *see also J.L.*, 529 U.S. at 271 (explaining that "[o]nly after police observation showed that the informant had accurately predicted the woman's movements, . . . did it become reasonable to think the tipster had inside knowledge about the suspect and therefore to credit his assertion about the cocaine"); *White*, 496 U.S. at 332 ("Anyone could have 'predicted' [the fact that the officers found a car precisely matching the caller's description in front of the 235 building] because it was a condition presumably existing at the time of the call. What was important was the caller's ability to predict respondent's future behavior . . . Because only a small number of people are generally privy to an individual's itinerary, it is reasonable for police to believe that a person with access to such information is likely to also have access to reliable information about that individual's illegal activities.").

The Court cannot conclude that the accuracy of the publicly available information provided by the tipster in this case supports the conclusion that the tipster had a "special familiarity" with Henry's affairs such that it would be reasonable to believe that the tipster had reliable information regarding Henry's illegal activities. Significantly, *White* was a "close case" applying the lesser standard of reasonable suspicion. As the Supreme Court explained in *J.L.*, the corroborated predictive information provided in the tip in *White* was "essential to the Court's decision in that case." *J.L.*, 529 U.S. at 271. Here, anyone could have "predicted" that Henry owned an Infiniti car, was a felon, and had a brother who was recently shot to death. When compared to the tip in *White*, the anonymous tip here lacks any corroborated hard-to-predict information that would be essential for a finding of even reasonable suspicion. Thus, the Court concludes that the magistrate lacked a substantial basis for concluding that there was probable cause to search Henry's car.[6]

---

[6] In arguing that the warrant was supported by probable cause, the Government relies on reasoning from *United States v. Coleman*, 383 F. App'x. 180 (3d Cir. 2010), that "the fact [a tipster] reported a weapon that [a suspect] actively concealed suggests the tipster may have had information not readily available to other members of the public." *Coleman*, 383 F. App'x. at 185. That reliance is misplaced. The preceding statement by the Third Circuit in *Coleman* is tethered to the fact that officers specifically observed Coleman exhibiting behavior consistent with a suspect who is currently concealing a weapon. *See id.* at 181-82, 184-85 (explaining how officers observed Coleman "blading" his body in a manner indicating concealment of contraband). Indeed, the anonymous tip provided only that Coleman was in possession of a firearm, not that he concealed it. *Id.* at 181.

In reaching this conclusion, the Court relies on the direction of *Gates*, *White*, and *J.L.* Nevertheless, the Court also considers the legal significance of the relevant facts in this case to be materially indistinguishable from the legal significance of the relevant facts in *Tuter*. As such, the Court is convinced that *Tuter* buttresses the Court's conclusion in this case. Additionally, the Court finds this case to be distinguishable from *Ritter*. The finding of probable cause in *Ritter* turned on the conclusion that an officer's previous observations of criminal activity on the premises at issue, in conjunction with an anonymous tip alleging such criminal activity was ongoing, could be viewed as establishing an identifiable pattern of criminal activity on such premises. The Court concludes that applying such a conclusion to the facts in this case would be a bridge too far.[7]

## B. *Good Faith Exception to the Exclusionary Rule*

The Government contends that the good faith exception to the exclusionary rule applies in this case.

In *United States v. Leon*, 468 U.S. 897 (1984), the Supreme Court established the "good faith" exception to the exclusionary rule. "The good faith exception instructs that suppression of evidence 'is inappropriate when an officer executes a search in objectively reasonable reliance on a warrant's authority.'" *United States v. Hodge*, 246 F.3d 301, 307 (3d Cir. 2001). The Third Circuit has explained the rationale behind the good faith exception to the exclusionary rule as follows:

> Because "the exclusionary rule is not an individual right," but is instead a means of deterring Fourth Amendment violations, it "applies only where it 'result[s] in appreciable deterrence.'" Suppression of valuable evidence imposes social costs by hindering the courts' truth-seeking function, but the Supreme Court has determined that those costs are outweighed by the need to

---

Here, officers did not observe any behavior by Henry to suggest that he actively concealed a firearm in his vehicle. Even were officers to do so, *Coleman* concludes only that such an observation is sufficient for reasonable suspicion, not the higher standard of probable cause. *Id.*

[7] The Court recognizes that one might argue that the reasoning in *Ritter* could be extended to conclude that a past pattern of criminal activity by an individual, in conjunction with an anonymous tip that the individual is currently engaging in that criminal activity, provides probable cause to believe that the individual is indeed currently engaging in that criminal activity. Here, officers were aware that Henry had a previous conviction for possession of an unregistered firearm from 2013. The Court declines to conclude that such information sufficiently corroborates the anonymous tip that Henry currently possessed an unregistered firearm. The simple fact that an individual engaged in certain activity in the past does not make an anonymous assertion that the individual is engaging in such activity currently reliable.

> prevent illegal and culpable law enforcement conduct. But because some unconstitutional conduct is unlikely to be deterred by the threat of sanctions, exclusion is not a blanket remedy. Where, for instance, a reasonable officer cannot have been expected to know that what he was doing was unconstitutional, he is unlikely to be discouraged in his actions by the knowledge that the fruits of unconstitutional searches will be suppressed. There is no sense in suppressing whatever evidence he may have uncovered in such a case, for the limited or nonexistent deterrent value of exclusion does not outweigh the cost.

*People of the V.I. v. John*, 654 F.3d 412, 417 (3d Cir. 2011) (citations omitted).

"The test for whether the good faith exception applies is whether a reasonably well trained officer would have known that the search was illegal despite the magistrate[judge's] authorization." *Hodge*, 246 F.3d at 307 (internal quotations marks omitted). "The mere existence of a warrant typically suffices to prove that an officer conducted a search in good faith and justifies application of the good faith exception." *Id.* at 307-08. Nevertheless, there are four situations in which the general presumption of good faith, which generally attaches based on the mere issuance of a warrant, is negated:

> (1) [when] the magistrate [judge] issued the warrant in reliance on a deliberately or recklessly false affidavit;
>
> (2) [when] the magistrate [judge] abandoned his judicial role and failed to perform his neutral and detached function;
>
> (3) [when] the warrant was based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; or
>
> (4) [when] the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized.

*Id.* at 308 (citations omitted).

The threshold for establishing the third exception—that the affidavit was "so lacking in indicia of probable cause as to render" the executing officers' belief unreasonable—"is a high one." *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1245 (2012). "In order to come within [this] exception[], [a defendant] must show, not just that the Magistrate Judge erred in issuing the search warrant at issue, but that the Magistrate Judge's error was so obvious that a law enforcement officer, without legal training, should have realized, upon reading the warrant, that it was invalid and should thus have declined to execute it." *United States v.*

*Ninety-Two Thousand Four Hundred Twenty-Two Dollars & Fifty-Seven Cents*, 307 F.3d 137, 146 (3d Cir. 2002). Such threshold may be met, for example, where the affidavit contains no indicia of probable cause with respect to the alleged criminal activity. *See e.g. John*, 654 F.3d at 418-19 (rejecting the good faith exception because "[e]ven a cursory reading of . . . [the] affidavit reveal[ed] that there [was] not a single assertion that [the defendant] was in any way associated with [the alleged criminal activity]") (internal quotation marks and citations omitted). The threshold may also be met where the affidavit relies on a single piece of stale evidence. *See United States v. Zimmerman*, 277 F.3d 426, 437 (3d Cir. 2002) (rejecting the good faith exception where the affidavit "recited information indicating that a single [pornographic] video clip . . . was located on a computer in [the defendant's] home no earlier than six months before the search").

Henry does not argue that the magistrate issued the warrant in reliance on a deliberately or recklessly false affidavit or abandoned her judicial role and failed to perform her neutral and detached function.[8] Nor does Henry argue that the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized. Henry argues only that the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.

The Court concludes that the good faith exception to the exclusionary rule applies. Based on the Court's examination of the binding and persuasive anonymous tip jurisprudence herein, the Court agrees with the conclusion reached by Judge Smith in *Ritter*: it would be unrealistic here to conclude that TFO Dominguez should have recognized, questioned, and correctly applied the nuances of anonymous tip corroboration doctrine. *Cf.*

---

[8] During oral argument at the December 2, 2020 omnibus hearing, Henry's counsel suggested that the normal practice in a case such as this—a case involving the possession of an unregistered firearm by a felon, which violates both local and federal law—is to bring the charges in a federal case. Henry's counsel further asserted that TFO Dominguez, in seeking a warrant from a magistrate judge in the Virgin Islands Superior Court took "the path of least resistance in obtaining a warrant that lacked probable cause." *See* Omnibus Hr'g Tr. at 45:10-12, Dec. 2, 2020, ECF No. 62. If Henry intended to imply that law enforcement sought a warrant from a magistrate judge in the Virgin Islands Superior Court rather that the District Court because the process would be less rigorous, the Court finds such an aspersion to be wholly inappropriate. There is no evidence that the Superior Court discharges its duties in a manner any less conscientiously than the District Court. Moreover, Henry presented no evidence that the magistrate judge who issued the January 10, 2020 warrant abandoned her judicial role or failed to perform her neutral and detached function in any way.

*Ritter*, 416 F.3d at 279 (Smith, J., dissenting in part). The Court's conclusion in this regard is a close call. In circumstances very similar to those in this matter, the Tenth Circuit's decision to apply the good faith exception turned largely on the fact that, when the warrant in that case issued, the Supreme Court's decision in *J.L.* had not yet been issued. *See Tuter*, 240 F.3d at 1299. Nevertheless, "the knowledge and understanding of law enforcement officers and their appreciation for constitutional intricacies are not to be judged by the standards applicable to lawyers." *See United States v. Tracey*, 597 F.3d 140, 152 (3d Cir. 2010) (quoting *United States v. Cardall*, 773 F.2d 1128, 1133 (10th Cir. 1985)). TFO Dominguez sought to corroborate the anonymous tip in this matter. He further included the results of the law enforcement investigation into the facts alleged by the anonymous tip in his affidavit of probable cause. While the Court has found that such corroboration was ultimately insufficient to support a finding of probable cause, the affidavit was not completely devoid of any indicia of probable cause. *Cf. John*, 654 F.3d at 418-19 (rejecting the good faith exception because "[e]ven a cursory reading of . . . [the] affidavit reveal[ed] that there [was] not a single assertion that [the defendant] was in any way associated with [the alleged criminal activity]") (internal quotation marks and citations omitted). Nor did the affidavit rely on a single piece of stale evidence. *Cf. Zimmerman*, 277 F.3d at 437 (rejecting the good faith exception where the affidavit "recited information indicating that a single [pornographic] video clip . . . was located on a computer in [the defendant's] home no earlier than six months before the search"). As such, the Court concludes that Henry has not met the high threshold for establishing that the third exception to the general presumption of good faith applies. Thus, the Court will not suppress the evidence obtained from the execution of the January 10, 2020 search warrant.

### C. Henry Made a Voluntary, Knowing, and Intelligent Waiver of his Miranda Rights

The Court now turns to whether it should suppress Henry's statements made to law enforcement. Henry argues that his statements were taken in violation of the Fifth Amendment because he made no voluntary, knowing, and intelligent waiver of his *Miranda* rights. Specifically, Henry argues that there was no evidence that he read or understood the standard FBI Advice of Rights form from which TFO Dominguez read Henry his rights.

Further, Henry argues that his statements that he would talk "when I'm ready, when I can go, then me and you will talk, okay" and "when I'm free to go," along with the fact the Henry refused to sign the waiver of rights portion of the FBI Advice of Rights form, demonstrate that Henry did not voluntarily waive his *Miranda* rights. Finally, Henry argues that he did not voluntarily waive his *Miranda* rights by speaking with the agents because the agents obtained his statements through deception—by initially discussing Henry's brother's murder then changing the topic of conversation to the subject of Henry's possession of a firearm.

To safeguard an individual's Fifth Amendment privilege against self-incrimination, the Supreme Court has held that the government may not introduce statements made by an individual who is subject to "custodial interrogation" unless he first has been given his *Miranda* warnings. *Miranda v. Arizona*, 384 U.S. 436, 445 (1966). The Court defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.*

Once a suspect has been Mirandized, the suspect must "unambiguously" invoke his right to remain silent or his right to counsel in order for those protections to attach. *See Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010) (holding that a suspect had to unambiguously invoke his right to silence in order for *Miranda* to require law enforcement to cease questioning); *Davis v. U.S.*, 512 U.S. 452, 461 (1994) (requiring a suspect to unambiguously invoke his right to counsel). The two-pronged test for voluntary, knowing, and intelligent waiver of one's *Miranda* rights is that

> [f]irst, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice

and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986). The Third Circuit has explained that

> [t]his inquiry requires us to consider the totality of the circumstances surrounding the interrogation, which includes examining the events that occurred and the background, experience, and conduct of the defendant. *Miranda* rights will be deemed waived only where the totality of the circumstances "reveal[s] both an uncoerced choice and the requisite level of comprehension."

*United States v. Sriyuth*, 98 F.3d 739, 749 (3d Cir. 1996) (quoting *Moran*, 475 U.S. at 421) (citations omitted).

With respect to Henry's awareness of both the nature of the rights being abandoned and the consequences of the decision to abandon them, the totality of the circumstances belies Henry's arguments. TFO Dominguez read Henry his *Miranda* rights, warning Henry that he had a right to remain silent, that any statement he made might be used as evidence against him, that he had a right to the presence of an attorney, either retained or appointed, and that if he chose to answer questions without an attorney present, that he had the right to stop answering questions at any time. When expressly asked whether he understood those rights, Henry responded affirmatively. When TFO Dominguez further explained that signing the form would mean that Henry had decided to speak to law enforcement without the presence of an attorney, Henry again responded with body language indicating he understood—by nodding his head and giving a thumbs up. The Court concludes that these circumstances demonstrate that Henry understood the nature of his rights and the consequences of abandoning them.

The fact that Henry may not have read the standard FBI Advice of Rights form when TFO Dominguez left it in the room with Henry does not compel a different conclusion. Significantly, there is no evidence that Henry's age, education, or experience were such that he did not, or could not, understand his rights as they were read to him. Indeed, if anything Henry's prior interaction with the criminal justice system, in which he was convicted of possession of an unlicensed firearm, suggests that Henry was aware of his rights and the consequences of abandoning them. *See, e.g., Miller v. Fenton*, 796 F.2d 598, 606 (3d Cir. 1986)

(concluding that the defendant was aware of the consequences of confessing because he had previous experience with the criminal system, including serving a jail sentence).

With respect to whether Henry voluntarily waived his rights, his statements that he would talk "when I'm ready, when I can go, then me and you will talk, okay" and "when I'm free to go" do not constitute unambiguous assertions that Henry wanted to remain silent. *Cf. Berghuis*, 560 U.S. at 381-82 (concluding that simply remaining silent was not an unambiguous invocation of the right to remain silent). Indeed, those statements indicate a willingness to speak with law enforcement. Henry points to no authority, nor is the Court aware of any, that suggests that the conditional nature of Henry's statements precludes a subsequent voluntary waiver of his rights. Additionally, the fact that Henry did not sign the waiver portion of the standard FBI Advice of Rights form does not preclude a subsequent voluntary waiver of his rights. *See North Carolina v. Butler*, 441 U.S. 369, 371, 373 (1979) (holding that an express written or oral statement of waiver is not necessary to establish waiver); *United States v. Plugh*, 648 F.3d 118, 125 (2d Cir. 2011) ("While his refusal to sign the form presented to him upon arrest may have unequivocally established that he did not wish to waive his rights *at that time,* his concurrent statements[—'I am not sure if I should be talking to you' and 'I don't know if I need a lawyer'—] made equally clear he was also not seeking to *invoke* his rights and thus cut off all further questioning at that point."); *United States v. Binion*, 570 F.3d 1034, 1041 (8th Cir. 2009) ("Refusing to sign a written waiver of the privilege against self incrimination does not itself invoke that privilege and does not preclude a subsequent oral waiver.").

Moreover, Henry's argument that any waiver was the product of deception—because the interview began with a lengthy discussion of Henry's brother's murder before turning to the subject of Henry's illegal possession of a firearm—finds no support. In *Colorado v. Spring*, 479 U.S. 564 (1987), the Supreme Court rejected the defendant's argument that the failure of agents to inform him that he would be questioned about a crime unrelated to that for which he was arrested "constituted official 'trickery' sufficient to invalidate his waiver of his Fifth Amendment privilege, even if the official conduct did not amount to 'coercion.'" *Spring*, 479 U.S. at 576. In doing so, the Supreme Court emphasized that it "has never held that mere

silence by law enforcement officials as to the subject matter of an interrogation is 'trickery' sufficient to invalidate a suspect's waiver of Miranda rights." *Id.*

Here, Henry knew that agents were searching his car for a firearm they suspected he illegally possessed. Indeed, during the interview, Henry acknowledged that he had read the search warrant for his car and was aware that agents were searching for a firearm. Henry also acknowledged that he knew he is not permitted to have a firearm. Moreover, at no time did TFO Dominguez or Agent Forvour make any misrepresentation regarding the scope of the interview. If failure to inform an individual that he will be questioned about a certain crime does not constitute deception sufficient to invalidate a waiver of one's *Miranda* rights, the Court cannot conclude that merely discussing another topic before addressing a crime which an individual is aware he is suspected of constitutes deception sufficient to invalidate a waiver of one's *Miranda* rights.[9] Indeed, the Supreme Court has "never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights." *Burbine*, 475 U.S. at 422. Significantly, "[o]nce it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law." *Id.* at 422-23.

Given the foregoing analysis and circumstances, the Court concludes that Henry was not deceived into waiving his rights. Further, the Court finds no evidence that Henry was intimidated or coerced. Indeed, the conversation between the agents and Henry was relaxed and cordial.[10] Significantly, the willingness to answer questions after acknowledging that one

---

[9] The Court recognizes that when police make affirmative misrepresentations while discussing another topic, such misrepresentations could be sufficiently coercive to invalidate a defendant's waiver of the Fifth Amendment privilege. *See, e. g., Lynumn v. Illinois*, 372 U.S. 528 (1963) (misrepresentation by police officers that a suspect would be deprived of state financial aid for her dependent child if she failed to cooperate with authorities rendered the subsequent confession involuntary); *Spano v. New York*, 360 U.S. 315 (1959) (misrepresentation by the suspect's friend that the friend would lose his job as a police officer if the suspect failed to cooperate rendered his statement involuntary). Here, however, Henry does not assert or argue that TFO Dominguez or Agent Forvour attempted to use the discussion regarding Henry's brother's murder to coerce Henry to confess. Indeed, after reviewing the recorded interview, the Court finds nothing coercive about the discussion regarding Henry's brother's murder.

[10] At one point, when Henry was denying "owning" a firearm, Agent Forvour asked, "you're leasing it?" Henry and the agents all laughed in response.

understands his *Miranda* rights is sufficient to constitute an implied waiver. *See United States v. Velasquez*, 626 F.2d 314, 320 (3d Cir. 1980). Here, Henry acknowledged understanding his *Miranda* rights and proceeded to answers questions willingly. Thus, the Court concludes that Henry knowingly and voluntarily waived his *Miranda* rights.

### D. Henry's Statements Were Voluntary

Henry also argues that his statements were taken in violation of the Fifth Amendment because they were not voluntary. Specifically, Henry argues that the circumstances leading to his statements were coercive. For example, Henry emphasizes that he was "taken into custody by a number of officers and then placed in an interview room," *see* Mot. to Suppress at 5, ECF No. 15, and also refused to sign a waiver of his *Miranda* rights on multiple occasions. Additionally, Henry asserts that "Officer Dominguez tried to coercively persuade Mr. Henry into waiving his rights by claiming that it would only mean that he agreed to talk." *Id.* Further, Henry argues that, after Officer Dominguez left the room and returned with FBI Special Agent Forvour, who immediately began to question Henry even though Henry had refused to sign the *Miranda* waiver, Henry "could only conclude that he had to answer." *Id.* Finally, Henry also argues that the interview was coercive and deceptive because the agents questioned Henry about possessing a firearm after speaking at length with Henry about his brother's murder.

Irrespective of *Miranda*, "[t]he Self–Incrimination Clause of the Fifth Amendment guarantees that no person 'shall be compelled in any criminal case to be a witness against himself.'" *Withrow v. Williams*, 507 U.S. 680, 688 (1993) (quoting U.S. Const., amend. V). This protection bars the introduction of statements to law enforcement that are not "voluntary." *Id.* A statement is voluntary only when the speaker's "will was not overborne," and the statement was the "product of an essentially free and unconstrained choice by its maker, that was the product of a rational intellect and a free will." *United States v. Swint*, 15 F.3d 286, 289 (3d Cir. 1994) (internal quotation marks omitted).

"[C]ourts look to the totality of circumstances to determine whether a confession was voluntary." *Withrow*, 507 U.S. at 693. Potential circumstances affecting the voluntariness of statements made include: (1) the length and location of the interrogation; (2) the defendant's

maturity, physical condition, mental health, and level of education; and (3) whether *Miranda* warnings were given. *Swint*, 15 F.3d at 289. "*[T]he* crucial element" of the inquiry, however, is "police coercion." *Withrow*, 507 U.S. at 693 (emphasis added). "Unless there is 'police conduct causally related to the confession,' a confession is considered voluntary. Thus, a court will not hold that a confession was involuntary unless it finds that it was the product of 'police overreaching.'" *Swint*, 15 F.3d at 289 (citations omitted) (quoting *Colorado v. Connelly*, 479 U.S. 157, 164 (1986)); *see also United States v. Flemmi*, 225 F.3d 78, 91 (1st Cir. 2000) ("[T]he Supreme Court has confined the voluntariness concept by holding that only [statements] procured by *coercive official tactics* should be excluded as involuntary.") (alteration in original and internal quotation marks omitted).

Considering the totality of the circumstances, the Court notes the following facts. First, no guns were drawn by any officers during the traffic stop. Second, the video of the interview reveals that the interview was conducted in a well-lit interview room which appeared spacious enough to comfortably accommodate the two agents, Henry, and the table at which they sat across from one another. Additionally, when Henry expressed feeling cold in the interview room, Agent Forvour retrieved a sweater for him. Henry was also read his *Miranda* rights by TFO Dominguez at the beginning of the interview. The conversation between the agents and Henry was relaxed and cordial. Indeed, at no time during the interview did the agents engage in any coercive tactics or make any misrepresentations to Henry. Further, while the entire interview lasted approximately two hours, Henry's statements were obtained approximately 20 minutes into the interview. Finally, nothing in Henry's maturity, physical condition, mental health, or level of education suggests that his statements were not the product of an essentially free and unconstrained choice.

Significantly, "'[a]ny statement given freely and voluntarily without any compelling influences is . . . admissible in evidence.' Ploys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda*'s concerns." *Illinois v. Perkins*, 496 U.S. 292, 297 (1990) (citations omitted). Here, the Court finds that nothing in the conversation regarding Henry's brother's murder compelled or coerced Henry to make statements regarding the firearm found as a result of

the search of his vehicle. Further, Henry was not deceived or misled as to the topic or scope of the interview. As such, in light of the circumstances above, the Court concludes that Henry's statements were voluntary. *Cf. United States v. Ludwikowski*, 944 F.3d 123, 136 (3d Cir. 2019) (concluding that a defendant's eventual statements regarding his own criminal activity were voluntary where the defendant initially went to the police to report that he was receiving extortionate threats and he was not deceived or misled as to the circumstances of his questioning); *Miller*, 796 F.2d at 605-07 (finding that the defendant confessed voluntarily where he was a mature thirty-two-year-old of normal intelligence with some high school education, had experience with the criminal system, received *Miranda* warnings, and the interview was friendly and lasted less than one hour).

## III.     CONCLUSION

For the reasons set forth above, the Court concludes the magistrate judge did not have a substantial basis to find that the January 10, 2020 search warrant was supported by probable cause. Nevertheless, law enforcement executed the search of Henry's car in objectively reasonable reliance on the warrant's authority. As such, the Court will not suppress the evidence obtained from the execution of the January 10, 2020 search warrant. The Court also concludes that the statements made by Henry on January 14, 2020, to TFO Dominguez and Agent Forvour were voluntary and taken in compliance with the strictures of the Fifth Amendment. As such, the Court will deny Henry's motion to suppress in total. An appropriate order follows.

**Dated:** March 19, 2021                              */s/ Robert A. Molloy*
                                                                    **ROBERT A. MOLLOY**
                                                                    **District Judge**